IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES JOSEPH HENKE,

                          Petitioner,

       v.

BRIAN FOSTER,[2]

                     Respondent.

OPINION & ORDER

13-cv-306-jdp[1]

Petitioner James Joseph Henke is currently in the custody of the Wisconsin Department of Corrections at the Green Bay Correctional Institution. He seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging state court convictions for second-degree intentional homicide with the use of a dangerous weapon and false imprisonment in Columbia County Case No. 09CF252. The petition is fully briefed and ready for decision. After considering the parties' submissions, I conclude that petitioner fails to show that the state is holding him in custody in violation of federal law with respect to any of his claims, so I will deny the habeas petition.

FACTS

The Wisconsin Court of Appeals summarized the events surrounding petitioner's convictions as follows:

> On June 19, 2009, there was a domestic violence incident at Henke's apartment between James Henke and a woman with whom Henke had been romantically involved. At trial, the

---

[1] This case was reassigned to me pursuant to a May 16, 2014 administrative order. Dkt. 13.

[2] I have amended the caption to name the current warden of the Green Bay Correctional Institution as the respondent in this case.

woman victim testified that she and Henke argued, that Henke "grabbed a hold of [her] neck," resulting in bruising, and that Henke would not let her leave his apartment when she attempted to leave.

Around the same time, the woman victim was also romantically involved with Thomas Kratz. She told Kratz about the domestic incident with Henke. Late in the evening of June 22, 2009, and early morning of June 23, while the woman victim was with Kratz at a bar, Henke sent a series of text messages to the woman victim, purporting to apologize. Kratz became agitated and spoke to Henke over the phone, stating that Kratz was coming to Henke's residence to "kick [Henke's] ass." Kratz and the woman victim left the bar in Kratz's vehicle, and arrived on the street outside of Henke's apartment building. Henke was waiting outside of his building with a knife. He approached Kratz in the middle of the street. A fight ensued and, during that fight, Henke fatally stabbed Kratz.

Based on the June 19 domestic incident, Henke was charged with multiple counts, including false imprisonment. Based on the June 23 stabbing, Henke was charged with first-degree intentional homicide. He was also charged with two counts of possession of a switchblade knife, which police discovered in Henke's apartment after the stabbing. Henke's trial counsel did not seek severance, and all of the counts were tried together. As to the homicide charge, Henke argued self-defense based on the assertion that Kratz attacked Henke with a metal pipe while Henke's back was turned and that Henke stabbed Kratz trying to fend off that attack.

The jury found Henke guilty of false imprisonment, a class H felony, and of the lesser-included offense of second-degree intentional homicide with use of a dangerous weapon, a class B felony. The jury also found Henke guilty of the two counts of possession of a switchblade knife, class A misdemeanors.[3]

Henke sought postconviction relief, which the circuit court denied after a *Machner* hearing.

*State v. Henke*, 2012 WI App 106, ¶¶ 3-7, 344 Wis. 2d 298, 821 N.W.2d 413 (unpublished opinion).

---

[3] Petitioner was also charged with and convicted of obstructing an officer concerning events related to the homicide charge. Dkt. 2-2.

The circuit court sentenced petitioner to fifteen years of initial confinement followed by five years of extended supervision. After the Wisconsin Court of Appeals affirmed the conviction, the Wisconsin Supreme Court denied his petition for review. Petitioner now brings this habeas action.

## ANALYSIS

Petitioner raised the following issues in his petition:

- the trial court erred by admitting evidence of petitioner's prior conviction for operating after revocation;

- the trial court erred by giving the jury an instruction on provocation;

- petitioner's trial counsel was ineffective by failing to object to the instruction on provocation;

- his trial counsel was ineffective by failing to sever the homicide charges from unrelated offenses alleged in the criminal complaint;

- his trial counsel failed to object to prosecutorial misconduct during voir dire; and

- trial counsel failed to introduce evidence that Kratz had a history of violent conduct.

Dkt. 1.

Respondent raises a preliminary question concerning the scope of this petition. Respondent argues that petitioner, in his briefing, attempts to raise issues not included in his petition, including a claim that the trial court erred by allowing a police officer to testify about the viability of petitioner's self-defense argument if petitioner was found to have possessed a weapon. I do not consider this to be a separate new claim. Petitioner's initial briefing mentions this issue only in passing, and the issue is closely related to the existing

question whether the instruction on provocation should have been given. Also, petitioner did not file a motion to amend his petition, and his reply brief reaffirms that he is bringing the six claims listed above. So I do not understand petitioner to be attempting to add new claims.

This court's authority to issue habeas corpus relief for persons in state custody is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This court may issue a writ under the "contrary to" clause of § 2254(d)(1) if the state court applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court opinions but unreasonably applies it to the facts of the particular case. *Id*. at 407-08.

This standard places a high burden on petitioner. *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013) ("This standard . . . is 'difficult to meet.'" (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011))). "Clearly established law" must be set out in the holdings of

4

Supreme Court decisions. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). "[A]n 'unreasonable application of' those holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Id*. (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). Rather, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The relevant state court decision for this court's review is the opinion issued by the Wisconsin Court of Appeals. *Stevens v. McBride*, 489 F.3d 883, 902 n.2 (7th Cir. 2007) ("For purposes of our review . . . the operative state-court decision 'is that of the last state court to address the claim on the merits.'" (quoting *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006))).

**A.  Petitioner's claims**

### 1.  Admission of evidence of petitioner's operation after revocation

Petitioner first argues that the trial court erred by allowing testimony about his operating a motor vehicle after revocation of his driver license. Petitioner characterizes this argument (as did his counsel on direct appeal) as admission of one or more convictions for operating after revocation. But as the transcript shows, it does not appear that petitioner was actually convicted of that offense. I understand petitioner to be arguing here that the trial court erred in allowing "other acts" evidence regarding his admitting to driving after revocation.

The following testimony was elicited by the state on cross-examination of petitioner:

> Q:   And you mentioned—or actually a couple of your friends today mentioned that you didn't have your cycle because you didn't have a driver's license, correct?
>
> A:   Correct.
>
> Q:   But you were still driving.
>
> A:   Yes. Not at that time though. I quit totally driving.
>
> Q:   When did you quit driving?
>
> A:   After I'd gotten my driving after revocation.
>
> Q:   Well, you weren't convicted of it, right?
>
> A:   Right.
>
> Q:   In fact, you had been caught by the police April 27th, May 14th, June 10th, and twice on June 15th [2009].
>
> [DEFENSE COUNSEL]: Objection; motion to strike.
>
> [DISTRICT ATTORNEY]: He opened the door, your Honor.
>
> (Bench conference held.)
>
> Q:   And, Mr. Henke, none of those are convictions, correct?
>
> A:   Correct.
>
> Q:   And then we've already heard testimony that—from you today that you drove to Montello on Thursday.
>
> A:   Yes.
>
> Q:   And you drove back to Pardeeville on Friday.
>
> A:   Yep.
>
> Q:   And then you drove again to take [the abuse victim] home on Saturday.
>
> A:   Yes.
>
> Q:   So when was it that you stopped after your driving after revocations?

6

A:      I was advised by a friend of mine to stop because it was
        too risky.

Q:      And you kept driving.

A:      I was advised after I took her back to Montello that I
        should not drive anymore.

Q:      So it was that very day that you were going to stop?

A:      I stopped, yes.

Dkt. 7-15, at 792-93.

As respondent points out, petitioner arguably failed to exhaust this claim because on direct appeal, he focused his argument on the theory that the admission of this evidence violated Wisconsin's "other acts" evidentiary rule, Wis. Stat. § 904.04(2), which is generally a question of state evidence law beyond the scope of federal habeas review. *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). The court of appeals' decision addressed the Wisconsin evidentiary issue and did not address a due process argument. But as discussed below, a state criminal defendant does have a due process right to a fundamentally fair trial, *id*. at 511-12, and petitioner at least alluded to the right to a fair trial in both his direct appellate briefing and his briefing in this habeas case, so I will consider the due process issue.[4]

The problem for petitioner is that the bar for a successful due process claim in this situation is very high. No United States Supreme Court case has held that the admission of evidence of other crimes violates a defendant's due process rights even if it is admitted to show the propensity of the defendant to commit crimes. *See Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) ("Because we need not reach the issue, we express no opinion on whether a

---

[4] Even if I concluded that petitioner failed to exhaust this claim, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").

As the Seventh Circuit has stated,

> when the state . . . fails to limit the prosecution's evidence, the only constitutional principle to which a defendant can appeal is a catch-all sense of due process, and the appeal almost always fails. If the evidence is probative, it will be very difficult to find a ground for requiring as a matter of constitutional law that it be excluded; and if it is not probative, it will be hard to show how the defendant was hurt by its admission.

*Watkins v. Meloy*, 95 F.3d 4, 6-7 (7th Cir. 1996) (citations omitted). State court evidentiary rulings only implicate the Due Process Clause when "evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice[.]'" *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). The Seventh Circuit has framed this standard in the context of evidentiary questions by asking "whether the probative value of the state's evidence was so greatly outweighed by its prejudice to [petitioner] that its admission denied him a fundamentally fair trial." *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994).

Petitioner does not satisfy that standard here. Respondent argues that the testimony at issue has probative value because it was elicited to impeach petitioner's credibility after he stated that he in fact quit driving after his license was revoked. This argument was accepted by the Wisconsin Court of Appeals regarding the question of admissibility under Wisconsin evidentiary rules because petitioner did not respond to it in his reply. Even in the current habeas case, petitioner does not develop an argument grappling with the impeachment issue.

Even if the probative value of this evidence was relatively low, petitioner fails to persuade me that it is greatly outweighed by its prejudice. It strains credulity to say that the

8

admission of driving a motor vehicle after revocation paints someone as a "bad person" in a way that would make it more likely that the person would commit the violent acts forming the core of this criminal case. Petitioner falls far short of showing that the admission of this evidence deprived him of a fair trial, so I will deny his habeas petition on this claim.

### 2. Jury instruction on provocation

Petitioner argues that the trial court erred by giving a jury instruction asking the jury to consider whether petitioner provoked the altercation with Henke, making it more difficult for petitioner to claim self-defense. Respondent argues that petitioner failed to exhaust this claim as well because he did not explicitly raise a due process challenge to the instruction in his direct appeal. In addition, respondent argues that in his direct appeal, petitioner did not bring a direct claim stating that the trial court erred in including the instruction. Instead, petitioner raised an ineffective assistance of counsel claim on counsel's failure to object to the instruction.

As with petitioner's other acts claim, I will consider the provocation instruction claim on due process grounds notwithstanding these concerns. I conclude that the claim is meritless.

The court gave the following instruction, based on Wisconsin Jury Instruction (Criminal) 815:

> You should also consider whether the defendant provoked the attack. A person who engages in unlawful conduct of the type likely to provoke others to attack and who does provoke an attack is not allowed to use or threaten force in self-defense against that attack.

> However, if the attack which follows causes the person reasonably to believe that he is in imminent danger of death or great bodily harm, he may lawfully act in self-defense. But the person may not use or threaten force intended or likely to cause

9

> death or great bodily harm unless he reasonably believes he has
> exhausted every other reasonable means to escape from or
> otherwise avoid death or great bodily harm.
>
> A person who provokes an attack, whether by lawful or unlawful
> conduct, with the intent to use such an attack as an excuse to
> cause the death or great bodily harm to another person is not
> entitled to use or threaten force in self-defense.

Dkt. 7-16, at 839-40.

The mere fact that an instruction was incorrectly given under state law is not in itself a basis for habeas relief. *Estelle*, 502 U.S. at 71-72. The right to have the jury properly instructed, similar to the other acts claim, is "one inherent in the broader right to a fundamentally fair trial guaranteed by the due process clause of the Fourteenth Amendment." *Perruquet*, 390 F.3d at 512. Petitioner argues that this instruction unnecessarily presented the jury with the provocation question as to his conduct because the facts show that Kratz provoked the altercation. Petitioner argues that if he had been the one who was killed in the altercation, it is likely that the state would have attempted to include a provocation instruction at Kratz's trial, which he sees as the state trying to "have it both ways." Dkt. 8, at 1.

The court of appeals summarized the issue as follows:

> In response to Henke's argument, the State points to evidence
> that, according to the State, supported giving the provocation
> instruction. Specifically, the State points to evidence that, after
> being told over the phone by Kratz that Kratz was coming to
> Henke's residence to "kick [Henke's] ass," Henke came outside
> his residence and waited downstairs for Kratz while holding a
> knife. When Kratz arrived, Henke was spinning the knife in his
> hand in a way that made the knife visible to Kratz as "plain as
> day." Henke then approached Kratz with the knife displayed,
> and met Kratz in the middle of the street, where a fight ensued.
> The State contends that, based on this evidence of Henke
> displaying a knife and approaching Kratz with it, the jury could

reasonably have found that Henke "provoked Kratz to swing at Henke with the pipe."

Henke does not address these circumstances. Rather, Henke focuses solely on the fact that, in the phone conversation, Kratz threatened to "kick [Henke's] ass," and told Henke he was coming. In making this argument, Henke seemingly assumes that it was not legally possible for Henke to provoke Kratz because Kratz had already decided to engage Henke in a fight. However, if this is his view, Henke provides no legal or logical support for it.

We agree with the State that the relevant question is whether Henke could have been found to have provoked the street fight that occurred and that this question is not resolved by the undisputed evidence that Kratz threatened Henke during an earlier telephone conversation. More simply put, the question is whether there was evidence that Henke provoked the actual fight, and this question is easily resolved against Henke. The jury instruction on provocation makes sense because, absent Henke's aggression at the scene, there might have been a less serious fight, or Kratz might have decided not to physically engage Henke at all.

*Henke*, 2012 WI App 106, ¶¶ 36-38.

Petitioner essentially argues that, as a matter of law, he could not have provoked the fight because Kratz threatened petitioner over the phone first. But he does not cite to any authority supporting this theory, and I can locate none. I agree with the analysis of the court of appeals that Kratz's threatening phone call and arrival outside petitioner's residence did not, as a matter of law, foreclose petitioner from acting in a way that provoked the ensuing fight. The evidence showing that petitioner approached Kratz while holding out his knife was sufficient to raise the issue of provocation to the jury. It was up to the jury to decide whether petitioner provoked the altercation, and the jury remained free to conclude that he had *not* provoked the incident, depending on how it weighed the evidence. The instruction was even

unreasonable; it certainly was not so prejudicial that it deprived petitioner of a fundamentally fair trial. Therefore, I will deny petitioner habeas relief on this claim.

### 3.  Ineffective assistance of counsel—failing to object to provocation instruction

The remainder of petitioner's claims are for ineffective assistance of trial counsel. Although the court of appeals cited to Wisconsin, rather than federal, cases for the standard for ineffective assistance of counsel, it did correctly identify the constitutional standard. *Henke*, 2012 WI App 106, ¶ 9 (quoting *State v. Roberson*, 2006 WI 80, ¶ 28, 292 Wis. 2d 280, 717 N.W.2d 111 (which in turn cites *Strickland v. Washington*, 466 U.S. 668 (1984), for the two-part test for ineffective assistance of counsel)). Therefore, the question in this case is whether the court of appeals' rejection of petitioner's ineffective assistance of counsel claims was either "contrary to, or involved an unreasonable application of" federal law clearly established by the Supreme Court in *Strickland*.

Under *Strickland*, a criminal defendant seeking to prove ineffective assistance of counsel must establish deficient performance and resulting prejudice. 466 U.S. at 690-92. To show deficient performance, a defendant must point to specific acts or omissions that were "outside the wide range of professionally competent assistance." *Id*. at 690. For its part, the court must "strongly presume[] [that counsel] rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

In addition, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, this standard is "doubly deferential" on habeas corpus review. *Id*; *see also Richter*, 562 U.S. at 105 (emphasizing that the standards created by *Strickland* and § 2254(d) are "highly deferential," and "'doubly' so" when applied in tandem) (citations and quotations omitted).

Petitioner's first ineffective assistance of counsel claim is that counsel failed to maintain his objection to the instruction on provocation.[5] But as discussed above, I have already concluded that it was reasonable for the court to include the instruction, so I will not conclude that the court of appeals unreasonably applied *Strickland* in denying petitioner's claim about counsel's failure to maintain his objection.

### 4.  Ineffective assistance of counsel—failure to sever charges

Petitioner argues that his trial counsel was ineffective by failing to sever the homicide charges from unrelated offenses alleged in the criminal complaint. More specifically, on direct appeal, petitioner argued that counsel failed to: (1) sever the domestic abuse charges concerning events occurring on June 19, 2009, from the homicide charge arising from the altercation between petitioner and Kratz on June 23, 2009; and (2) sever the switchblade charges from the homicide charge. I will consider both of these arguments.

#### a.  Domestic abuse charges and homicide charge

Petitioner argues that the failure to sever the domestic abuse charges and the homicide charge prejudiced his defense in both of the potentially severable cases. The court of appeals addressed this argument as follows:

---

[5] Petitioner's counsel initially objected to the instruction but then withdrew that objection. *See* Dkt. 7-16, at 818-19, 834.

a. Effect On Homicide Count

Based on the June 19 domestic incident, Henke was charged with battery, disorderly conduct, and false imprisonment. Henke contends that much of the evidence for those counts was irrelevant to the homicide case. It follows, in Henke's view, that severance was warranted to avoid a risk of unfair prejudice. *See State v. Bettinger*, 100 Wis. 2d 691, 696-97, 303 N.W.2d 585 (1981) (stating that, when a trial encompasses multiple counts, there is a risk that the jury will improperly "consider that the defendant is a 'bad person' prone to criminal conduct," but that, "when evidence of both counts would be admissible in separate trials, the risk of prejudice arising due to a joinder of offenses is generally not significant").

Henke asserts that, here, prejudice was "overwhelming" because of a difference between what the jury would have heard about the domestic incident in a stand-alone homicide trial versus what the jury heard about the domestic incident in the joint trial that was held. We reject this argument because Henke fails to develop it.

Henke concedes that some information about the domestic incident would have been admissible in a stand-alone homicide trial. Specifically, Henke concedes that what the woman victim told Kratz about the domestic incident was admissible with respect to the homicide charge. As Henke recognizes, that evidence provided context for the fight between Henke and Kratz, and supported Henke's defense that Kratz was "motivat[ed] . . . to attack" Henke based on anger over the domestic incident.

On this topic, the State summarizes the what-Kratz-was-told evidence as follows: "Kratz . . . became angry at Henke when he heard [the woman victim] claim that Henke had beaten her in recent days, when he saw bruises on her body that allegedly went back to the recent incident, and when he saw a series of text messages in which Henke was apologizing in the aftermath of the incident and pleading with [the woman victim] to stay with him." Henke does not dispute this summary and, thus, does not dispute that, regardless of severance, the jury would have heard that the woman victim told Kratz that Henke had "beaten" her to the point of causing visible bruising.

Accordingly, this is not a situation where severance would have prevented a jury from hearing about the domestic incident and

the allegation that Henke battered the woman victim. Henke's argument, so far as he explains it, is that the lack of severance led to the admission of more details about the domestic incident and that the admission of these additional details mattered. Henke, however, merely makes this general assertion without pointing to specific evidence or providing an explanation as to why such specific evidence would have made a difference. Thus, Henke fails to provide a developed prejudice argument, and we reject it on that basis.

Before leaving this topic, we observe that our review of the record indicates that Henke's trial counsel could have reasonably thought that a joint trial of the charges could help Henke. That is, to the extent that not severing meant that more evidence of the domestic incident was before the jury, at least some of that additional evidence placed Henke in a more positive light. For example, at trial, the woman victim did not maintain that Henke intentionally "beat" her, but rather agreed that statements she made in a 2009 affidavit, in which she stated that she and Henke "briefly struggled" but that "Henke was not trying to injure [her]," were true. For his part, Henke testified at trial that he did not beat the woman victim or cause her bruises. Thus, it appears that a joint trial of the domestic incident charges and the homicide charge gave the jury an opportunity to hear some evidence favorable to Henke that the jury would not have heard in a separate homicide trial.

b. Effect On False Imprisonment Count

We turn to Henke's argument that not severing harmed him with regard to the false imprisonment count. Henke argues that, "[a]t a trial on the . . . domestic charges involving [the woman victim], the fact that defendant was accused of committing the offense of first degree homicide several days later would never have been admissible against defendant during that trial." Henke, however, does not persuade us that a failure to seek severance was deficient performance in the circumstances of this case.

Henke's trial counsel, understandably, was more concerned about the homicide charge than he was about the domestic incident charges. And, with respect to counsel's decision not to seek severance, counsel focused on the possible benefits that a joint trial would have with regard to the homicide charge. In keeping with this focus, Henke's trial counsel explained at the postconviction hearing that he believed the domestic incident

> provided useful "context" for the homicide incident and that inconsistent statements made by the woman victim about the domestic incident were useful for impeaching her credibility and, thus, cast doubt on her statements about the homicide. Henke appears to contend that these reasons for not severing were flawed because these goals still could have been achieved in a separate homicide trial.
>
> Henke does not, however, explain how these goals could have been accomplished in a severed homicide trial or, as importantly, how they could have been accomplished to the same degree. For example, Henke does not explain what mechanism he believes would have allowed his trial counsel to successfully introduce all of the inconsistencies in the woman victim's accounts of the domestic incident and their context in a trial solely about the homicide. Accordingly, Henke's argument lacks development.

*Henke*, 2012 WI App 106, ¶¶ 13-21 (alterations in original).

In considering this claim, I note that the court's analyses of the prejudice regarding the domestic abuse charges and homicide charge are at least superficially at odds with each other. The court determined that the state would have been able to bring evidence about the domestic abuse charges at the homicide trial regardless whether the charges were severed. But on the other hand, the court also determined that petitioner did not explain how he would have been able to introduce any useful evidence about the domestic abuse victim's testimony at a severed homicide trial.

There was at least one obvious downside to keeping the charges together. If the cases had been severed, then the state would not have been able to present evidence regarding the events of November 23 (including the homicide) at the domestic abuse trial. It also stands to reason that petitioner would still have been able to bring at least *some* of the beneficial domestic abuse evidence at the severed homicide trial. But the court of appeals concluded that petitioner failed to develop an argument showing precisely how severance would have

been clearly favorable for the homicide trial, and thus failed to show that counsel's performance was deficient.

The main takeaway from the court of appeals' decision is that petitioner failed to explain with any precision how the benefits of severing the charges were great enough to overcome the presumption of reasonableness accorded to counsel's strategic decision not to sever. *See Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) ("To avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight, *Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable."). There were pros and cons to severance, and petitioner has not shown how his counsel's strategic choice disadvantaged him. The court of appeals and this court must give deference to counsel's conclusion that petitioner's homicide defense would be served by allowing for a full presentation of the domestic abuse victim's inconsistencies.

Even now at the habeas stage, petitioner argues only that "[t]he domestic abuse charges were so far removed from the facts of the homicide charge, so as to be highly prejudicial to try both at the same trial," Dkt. 12, at 5. Given the deference this court must give to both the court of appeals and to counsel's strategic decisions, this vague assertion is nowhere near sufficient to show that the court of appeals erred in ruling on petitioner's ineffective assistance of counsel claim regarding severance of the domestic abuse and homicide charges.

### b. Homicide and switchblade charges

Petitioner argues that the second alleged error prejudiced him on the homicide charges because it allowed evidence of his switchblade ownership to be brought into the homicide case. The court of appeals addressed this argument as follows:

17

> Henke also argues that his trial counsel should have sought severance of the possession of switchblade counts from the homicide count. Two switchblades were found in Henke's apartment, and neither of these was used in the stabbing. Henke asserts that the switchblade evidence did not overlap with the homicide case, and that presenting the switchblade charges in the same trial improperly "allowed the jury to infer defendant was a bad person who possessed illegal weapons when considering the homicide count."
>
> Accepting that Henke is correct that the switchblade evidence did not meaningfully overlap with the homicide case, we nonetheless agree with the State that Henke's argument fails under the prejudice prong.
>
> First, we observe that the primary focus at the six-day trial was the homicide charge and the events surrounding the fight between Henke and Kratz. Very little time was spent on the possession of switchblade counts, which were relatively simple charges requiring little by way of evidence or argument.
>
> Second, Henke does not explain, and we do not discern, anything particularly inflammatory about knowing that Henke possessed illegal switchblade knives in a drawer in his apartment. This is especially true in light of evidence presented to the jury showing that Henke had a weapons collection in his apartment, including "axes, knives, and swords."

*Henke*, 2012 WI App 106, ¶¶ 22-25.

Petitioner's weapon collection is plainly not a favorable fact for him. But petitioner does not develop an argument in his briefs for why the court of appeals' conclusion was wrong. The court of appeals reasonably applied the *Strickland* prejudice prong on this issue. It is difficult to see how the switchblade evidence could have affected the outcome of petitioner's homicide charge given the evidence that he possessed many other blade weapons, which were presumably legally owned. It is not plausible that the mere fact of the switchblades' illegality—as distinct from petitioner's collection of a variety of blade

18

weapons—would lead the jury to draw an unfair inference about petitioner's character or propensity to commit a violent crime.

### 5.  Ineffective assistance of counsel—voir dire

Petitioner contends that his counsel was ineffective for failing to object to two portions of the voir dire: (1) the prosecutor's questions about the behavior of domestic abuse victims; and (2) the prosecutor's questions about self-defense.

#### a.  Behavior of domestic abuse victims

Included in the voir dire were the following questions by the prosecutor about the behavior of domestic abuse victims:

> Okay. Is there anyone here that finds it hard to understand that a victim of domestic violence may still love their abuser even though they're being abused? Everyone understand that that can happen in a domestic violence situation?
>
> Is there anyone who believes that they would not be able to understand that a victim who loves the abuser may feel that everything will just get better if she just covers up for his actions? Anyone disagree that that can happen sometimes in domestic violence?
>
> Now, sometimes a victim may not want to testify against her abuser because she has feelings of love or loyalty, fear, or the defendant may even—or the abuser may even use some persuasion against the victim.
>
> Does everybody understand that that can happen in a domestic violence situation? Anyone that doesn't think that happens, or that you find it so unbelievable that you would hold it against the victim?
>
> Do you also understand that sometimes domestic violence victims will change their stories because of those same factors?

Dkt 7-7, at 67-68.

19

In his direct appeal, petitioner argued that trial counsel was ineffective for failing to object to these questions, characterizing it is improper expert testimony. The court of appeals ruled as follows:

> Henke complains that his trial counsel deficiently failed to object when the prosecutor's questioning during voir dire included comments about the behavior of domestic abuse victims. Henke refers to the fact that the prosecutor asked whether potential jurors understood that domestic abuse victims might have feelings for an abuser, might fear an abuser, or might be persuaded by an abuser and, as a result, "may not want to testify against her abuser" or "will change their stories because of those . . . factors." Henke complains that the questions were not proper under the voir dire statute, WIS. STAT. § 805.08(1). He further asserts that the questions were unfairly prejudicial because they "had the impact of expert testimony" and gave the prosecution "the benefits of expert testimony without having [to] take the risks associated with calling such an expert."
>
> Although the question is debatable, we will assume for purposes of this discussion only that the factual assertions made by the prosecutor in questioning jurors were objectionable. Nonetheless, we agree with the State that prejudice, if any, was minimal and plainly not enough to undermine our confidence in the outcome.
>
> As the State points out, "[c]omments of counsel during voir dire are not evidence and the jury was so instructed." The jury was admonished, both before and after the evidentiary phase of the trial, to only consider sworn testimony of witnesses, exhibits received into evidence, and stipulated facts. The jury was further instructed that "[r]emarks of the attorneys are not evidence. If the remarks suggested certain facts not in evidence, disregard the suggestion." We agree with the State that we should assume the jurors followed these instructions and did not interpret the prosecutor's comments as providing, in effect, expert testimony that the jurors could or should consider. *See State v. Grande*, 169 Wis. 2d 422, 436, 485 N.W.2d 282 (Ct. App. 1992) ("The jury is presumed to follow all instructions given.").
>
> Furthermore, to the extent the prosecutor made factual assertions, those assertions are of a type not likely to improperly influence jurors. It is not apparent that the jurors would have perceived the prosecutor's references to the behavior of domestic

20

abuse victims in general as anything more than an appeal to the jurors' common sense. For example, the prosecutor's assertion that domestic abuse victims sometimes love and cover up for their abusers was, on its face, an assertion by the prosecutor that this is an accepted fact by most people. It would seem that most, if not all, of the potential jurors, based on their life experiences or exposure to victim accounts, likely believed these things about domestic abuse victims to be true. However, any potential juror who did not believe them to be true was not likely to change his or her mind based on the brief and bald assertion by the prosecutor.

Accordingly, the absence of an objection at voir dire to comments about the behavior of domestic abuse victims does not undermine our confidence in the verdicts.

*Henke*, 2012 WI App 106, ¶¶ 26-30 (footnotes omitted).

Petitioner renews his argument that the comments at voir dire were improper expert testimony. He cites to a First Circuit case for the proposition that comments made by a prosecutor can warrant reversal. Dkt. 12, at 8 (citing *United States v. Hardy*, 37 F.3d 753 (1st Cir. 1994) (prosecutor's comment on criminal defendant's silence at trial violated Fifth Amendment)). This is an uncontroversial proposition, but not every objectionable comment is so prejudicial to warrant a new trial. Petitioner's task is to show that the court of appeals unreasonably applied *Strickland*. He needs to show that no fairminded jurist could conclude anything other than that the prosecutor's comments were so prejudicial that the fairness of the trial was undermined.

Nothing in petitioner's briefs comes close to meeting this high standard. Rather, I conclude the court of appeals' ruling that petitioner was not prejudiced is reasonable, given that the court instructed the jury that the attorneys' remarks were not evidence, and that the comments here could be interpreted as "common sense" assertions about victims of domestic abuse that did not have to be accepted as true for the particular victim in petitioner's case.

21

**b. Self-defense**

Petitioner argues that trial counsel was ineffective for failing to object to another portion of voir dire, in which the prosecutor questioned a juror (a correctional officer) about how he had acted or had been trained to act in self-defense:

> [PROSECUTOR]: Is there anyone that disagrees with the law that states the use of force in self-defense is limited, that the amount of force used must only be that which is necessary to prevent the interference?
>
> Anybody that believes that in self-defense a person should be able to use any and all force?
>
> * * *
>
> [JUROR]: Right. I—you must not have saw my hand. I did have to defend myself at my line of work—
>
> [PROSECUTOR]: Okay, okay.
>
> [JUROR]: —a couple times.
>
> [PROSECUTOR]: And in doing that, did you limit yourself to just what needed to be done to stop it?
>
> [JUROR]: Yes, yes. For what I was trained to do.
>
> [PROSECUTOR]: So you used your training as well.
>
> [JUROR]: Right.
>
> [PROSECUTOR]: And in your training as a correctional officer, you're trained in a continuum of what you use, right?
>
> [JUROR]: You—
>
> [PROSECUTOR]: You start out with the least amount of force—
>
> [JUROR]: Right. That's what we used. It was the least amount of force. There were no weapons involved. It was mostly the hands.
>
> [PROSECUTOR]: Okay. And you actually probably could have gotten weapons available if you needed to, right?

22

[JUROR]: No.

[PROSECUTOR]: You couldn't call in any back-up or anything?

[JUROR]: There's usually back-up there, but we don't carry weapons.

[PROSECUTOR]: Right. You don't carry the weapons, but you could have called them in.

[JUROR]: Yes. There was more—when it happened, he attacked me and there was about four other people that was right there.

[PROSECUTOR]: And did every one of you use only the force necessary to stop the attack?

[JUROR]: Yes, um-hum.

[PROSECUTOR]: Once the attack stopped, did you stop—

[JUROR]: Yeah.

[PROSECUTOR]: —using the force?

[JUROR]: [Nods head up and down.]

Dkt. 7-7, at 71-74. In his direct appeal, petitioner argued that it was improper for the prosecutor to elicit "specific facts" from the juror's experience to show that petitioner could have stopped short of using lethal force too, and that counsel was ineffective for failing to object to this questioning. The court of appeals rejected this argument:

> Henke appears to argue that knowing about this juror's experience unfairly suggested to jurors that Henke should have been able to use non-lethal force. Once more, Henke complains that his counsel deficiently failed to object. We disagree.
>
> First, Henke does not explain, and we do not perceive, any conflict between the juror's answers and the law that the jury was asked to apply. As the State points out, Henke's trial counsel, at the postconviction hearing, pointed to this lack of conflict as the reason for why he did not object. Second, as the State explains, whether Henke used a proper level of force when defending himself has no apparent connection to the force used by a correctional officer in a particular situation. Simply put,

23

> Henke provides no reason to suppose that these voir dire answers would have caused the jury to think that Henke was not permitted to use self-defense as described in the jury instructions. It follows that the absence of an objection to this questioning was not deficient performance.

*Henke*, 2012 WI App 106, ¶¶ 31-32.

Petitioner fails to develop an argument explaining why he believes this analysis is so manifestly incorrect that no fairminded jurist could agree with the court's conclusion. The court agreed with trial counsel's explanation at the *Machner* hearing that the juror merely restated concepts of reasonable force consistent with the Wisconsin self-defense law as they applied to the juror's experience. Not all incidents involving self-defense are the same, and the jurors were presented with instructions making clear that lethal force *could* be reasonable in certain situations. I conclude that it was reasonable for the court to conclude that counsel was not deficient for failing to object.

### 6. Ineffective assistance of counsel—Kratz's violent tendencies

Petitioner argues that trial counsel was deficient by failing to counter character testimony from Kratz's friend that he was a "very nice man, very soft-spoken," Dkt. 7-12, at 493, by introducing evidence regarding Kratz's history of domestic violence. At the *Machner* hearing, trial counsel stated as follows:

> Q: Okay. Was there any other reason why you would not have [produced evidence of Kratz's history] in this particular case?

> A: Well, the evidence at trial had Kratz as a loud, very angry person at the bar before he called Henke and threatened to kill him and drove twenty miles. So I probably was focusing on that.

> The information was there to the contrary. And I may have seen the domestic violence as irrelevant; in other words, this had to do with a homicide, you know, self-defense, an attack between one man and another.

24

Dkt. 7-18, at 34-35.

The court of appeals rejected petitioner's argument:

> In reply, Henke takes the position that there was no "good reason" not to have brought up the past domestic violence convictions because it could have had some impact on the jury's view of Kratz. However, Henke's assertion does not come to grips with the State's core point—that trial counsel viewed Kratz's past domestic violence convictions as providing minimal insight into Kratz's behavior toward a man in the circumstances of this case. For that matter, other reasons for not cross-examining on this topic are readily apparent. For example, trial counsel could also have reasonably believed that raising past domestic incidents, with no apparent connection to the fight here, might be viewed by the jury as an effort to smear the victim, something that might have backfired on Henke.
>
> In sum, Henke fails to show that trial counsel was deficient.
>
> We also conclude that there is no reason to think that Henke was prejudiced. As the State explains, the jury had before it evidence contradicting the suggestion that Kratz was a peaceful person and, in particular, contradicting that Kratz acted peacefully on the night of the fight. On cross-examination, Kratz's friend stated or agreed that, on the night of the homicide, Kratz was yelling at the woman victim in anger for "maybe fifteen, twenty minutes or longer," was using profanity, and showed other signs of anger. And, Kratz threatened Henke and wielded a pipe when confronted by Henke. This evidence tended to dispel the suggestion that Kratz was, as a general matter, a peaceful person.

*Henke*, 2012 WI App 106, ¶¶ 42-44.

The main thrust of petitioner's argument is that regardless of the other evidence already in the case, there would have been no disadvantage to producing evidence of Kratz's history of violence. The court of appeals disagreed and noted the potential disadvantages. Petitioner has not shown that the court of appeals misapplied *Strickland* based on the concern that counsel failed to provide *every* possible piece of evidence rebutting Kratz's friend's character testimony. As trial counsel pointed out, there was plenty of more direct evidence of

Kratz's loud and threatening behavior in the case that served to make that rebuttal. Counsel's choices as to which pieces of evidence to bring forth and which to discount as cumulative were his strategic choices to make. The record shows that counsel's reasoning was well within the scope of effective representation.

Petitioner also appears to argue that counsel was ineffective by not *investigating* Kratz's criminal history. To the extent that petitioner intends this to be a separate claim, he failed to exhaust it by raising it to the Wisconsin Court of Appeals. And his argument about counsel's failure to investigate is contradicted by the evidence—counsel testified that he was in fact aware of Kratz's domestic violence convictions. Counsel acted reasonably in choosing to focus on the evidence more directly related to the events of the case showing Kratz to be threatening.

Because I conclude that petitioner has failed to show he is entitled to habeas relief regarding any of his claims, I will dismiss this action.

## B.  Certificate of appealability

Under Rule 11 of the Rules Governing Section 2254 Cases, the court must issue or deny a certificate of appealability when entering a final order adverse to petitioner. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the

issues presented were adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted).

For the reasons already stated, I conclude that petitioner has not made a showing, substantial or otherwise, that his conviction was obtained in violation of clearly established federal law as decided by the Supreme Court. Because reasonable jurists would not debate whether a different result was required, and I see no basis to encourage further proceedings, I will not issue petitioner a certificate of appealability.

## ORDER

IT IS ORDERED that:

1.  James Joseph Henke's petition for a writ of habeas corpus under 28 U.S.C. § 2254, Dkt. 1, is DENIED, and this case is DISMISSED. The clerk of court is directed to enter judgment for respondent and close this case.

2.  A certificate of appealability is DENIED. Petitioner may seek a certificate from the court of appeals under Fed. R. App. 22.

Entered December 7, 2015.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge